# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CT-00385-SCT

*FELICIA WELLS AND REGINALD WELLS*

*v.*

*JAMES (MARTY) TUCKER, M.D., INDIVIDUALLY AND IN THE SCOPE OF HIS EMPLOYMENT AND/OR AGENCY FOR JACKSON HEALTHCARE FOR WOMEN, P.A.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/2005 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROGEN K. CHHABRA |
| | DARRYL MOSES GIBBS |
| | JONATHAN C. TABOR |
| ATTORNEYS FOR APPELLEE: | WHITMAN B. JOHNSON, III |
| | SHELLY G. BURNS |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 10/02/2008 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:


**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This case is before the Court on a petition for writ of certiorari filed by James (Marty)

Tucker, M.D., after a majority decision of the Court of Appeals (two judges not participating)

which reversed the Rankin County Circuit Court's judgment entered in favor of Dr. Tucker, consistent with the jury's verdict finding in favor of the defendants in this medical-malpractice case. ***Wells v. Tucker***, 2007 Miss. App. LEXIS 594 (Miss. Ct. App. Sept. 4, 2007). Finding error, we reverse the judgment of the Court of Appeals and reinstate and affirm the trial court judgment entered in favor of Dr. Tucker.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     Felicia Wells's baby girl was delivered by a Cesarean section performed by Dr. Tucker and Dr. Charles Bush of Jackson Healthcare for Women, P.A., on February 6, 2000. Due to various complications, Wells underwent emergency surgery a few days later at River Oaks Hospital, and when she awoke from surgery, she discovered she had a colostomy bag. After approximately ten days at River Oaks, Wells was transferred to St. Dominic's Hospital and ultimately was released to go home on February 23, 2000. Approximately three months later, Wells returned to St. Dominic's to have her colostomy reversed. ***Wells v. Tucker***, 2007 Miss. App. LEXIS 594, \*\*3-4, ¶¶5-8.

¶3.     The procedural history of this case in the trial court is set out herein virtually verbatim from the Court of Appeals' opinion, exclusive of footnotes 1 and 2.

¶4.     On January 29, 2002, the Wellses filed a complaint in the Rankin County Circuit Court against Dr. Tucker and various other entities. Dr. Tucker denied liability. The parties conducted discovery and designated their experts. On September 26, 2003, Dr. Tucker designated three potential expert witnesses: Dr. Paul Rice, Dr. John Colter Morrison, and Dr. Edward Rigdon. Additionally, Dr. Tucker reserved the right to call Dr. Kim Nichols and Dr.

Charles Bush. Dr. Nichols and Dr. Bush both practiced with Dr. Tucker. Finally, Dr. Tucker reserved the right to testify as to his own expert opinion.

¶5. The central issue on appeal involves the fact that Dr. Tucker and some, if not all, of his experts were members of, and had their medical malpractice liability policies through, the same insurer – Medical Assurance Company of Mississippi (MACM). A nonprofit corporation, MACM is a limited pool of Mississippi physicians who are self-insured for protection against medical negligence suits.

¶6. On November 10, 2003, the Wellses filed a combined motion in limine and a motion to strike Dr. Tucker's experts as cumulative and biased. According to the Wellses, the circuit court should exclude their testimony as inherently biased. Alternatively, and most pertinent to our present purposes, the Wellses sought to cross-examine Dr. Tucker's experts concerning their commonality of insurance coverage to demonstrate bias via an alleged direct and personal financial interest in the outcome of the *Wells v. Tucker* lawsuit. The Wellses alleged that "MACM insureds are shareholders in MACM and all carry 'equity' accounts. The equity accounts are basically retirement accounts that prosper and grow as premiums increase and payouts decrease."

¶7. Dr. Tucker responded to the Wellses' 2003 motion in limine and argued that the circuit court should not preclude him from calling his designated expert witnesses. Dr. Tucker also argued that the circuit court should not allow the Wellses to cross-examine his experts regarding the fact that they share a common insurance carrier. Dr. Tucker attached

3

the affidavit of Michael Houpt, the chief executive officer of MACM, as an exhibit to his

response. According to Houpt's affidavit:

> 5. [MACM] is a non-profit corporation organized pursuant to Miss. Code Ann. Section 83-47-1, et seq. and has no shareholders. Physicians insured by [MACM] are merely members of the company.
>
> 6. According to the Bylaws of [MACM], the annual net profit or loss, as the case may be, of [MACM] is allocated among the physicians who are insured by [MACM] (the "equity accounts"). Such allocation is only "on paper" because no assets of [MACM] are actually segregated or transferred into separate accounts.
>
> 7. The physicians have no vested interest in the amounts represented by the equity accounts. Each physician insured by [MACM] has only a contingent right to receive the amount represented by the physician's equity account. The physician can receive said amount only if the physician dies, becomes permanently disabled or retires while insured by [MACM]. Except for such death, disability or retirement, a physician loses the amount represented by the physician's equity account upon termination, cancellation or other non-renewal of the physician's insurance coverage with [MACM].
>
> 8. The equity account does not earn interest and cannot be encumbered, transferred or assigned by the physician. [MACM's] liability for payment of the amounts represented by the equity accounts is subordinate to the general creditors of [MACM]. The equity accounts are not retirement accounts.
>
> 9. There are presently 2,424 physicians eligible to receive allocation to their equity accounts for 2003; after consideration of applicable reinsurance, the maximum indemnity retained by [MACM] on this claim against Dr. Tucker is $500,000; and the allocation to the equity accounts is based upon after-tax profits of [MACM]. In the event Plaintiffs receive a verdict for damages against Dr. Tucker in the above styled and numbered action, the maximum amount by which any physician's equity account balance can be affected is only $136.00.

¶8.     On December 15, 2003, the circuit court issued its order and resolved the Wellses'

motion in limine. The circuit court overruled the Wellses' request to strike Dr. Tucker's

experts. As for the Wellses' request to cross-examine Dr. Tucker's experts to demonstrate bias through commonality of insurance coverage, the circuit court found, "under Rule 403, any probative value that may flow from the examination of the witness in this area is far outweighed by the prejudice that would result from the admission of the insurance issue before the jury." Accordingly, the circuit court refused to allow cross-examination of Dr. Tucker's experts on the subject of commonality of insurance coverage.

¶9. On November 7, 2005, the Wellses filed "consolidated motions in limine and renewal of previous motion in limine and motion to strike." Among other things, the Wellses renewed their request that they be allowed to cross-examine Dr. Tucker's experts to show that, like Dr. Tucker, they had medical professional liability policies with MACM and, as a result, they were biased in favor of Dr. Tucker due to their direct personal financial interest in the outcome of the litigation.

¶10. The parties went to trial on November 8, 2005. Before jury selection, counsel for the Wellses brought to the circuit court's attention that the Wellses had renewed their request to cross-examine Dr. Tucker's experts regarding commonality of insurance coverage. At that point, the following exchange transpired:

> THE COURT: I understand. And you are not waiving your argument, and I'm reserving ruling for whenever you make this argument during the course of trial should you feel it becomes necessary. And then relative to the MACM issue, Mr. Johnson?
>
> MR. JOHNSON [counsel for Dr. Tucker]: You had already ruled on, Judge.
>
> THE COURT: Have I?

MR. JOHNSON: Yes sir, and overruled their motions under the case of [*Toche v. Killebrew*, 734 So. 2d 276 (Miss. Ct. App. 1999)], I believe; and having overruled it, if you grant it now, then I've got [to] ask for a continuance because you've just gotten rid of all my experts.

THE COURT: Well, I thought I saw that order in there.

MR. JOHNSON: Yes, sir, I have a copy.

THE COURT: I guess I should just rely on my previous correct ruling.

MR. GIBBS [counsel for the Wellses]: If I may, I know you were talking about striking the experts. I know you've rendered on that, your Honor. Will you allow cross[-]examination into their monetary interest within MACM, as supported by the affidavit filed by Mr. Johnson in response to my motion? It shows a potential interest, which I think it's distinguished from [Toche], which only dealt with a common carrier. In this situation, the MACM insurers have equity handles, and that's the only issue, if I can be allowed cross[-]examination at that point.

MR. JOHNSON: And again, you've already ruled on that. And if you're now going to let him go into it, then I'm in a position of having a ruling taken away from me where I would have done something different. Additionally, Judge, if I remember right, and I don't have it here, I'm looking at the order. The court found that the financial aspect under 403, any probative value is outweighed by the prejudice. And financial orders are refrained from raising that issue. And if I recall correctly, Judge, the hourly rate of each of these experts, the hourly rate, the per hour rate of each of these experts is greater than any potential impact.

THE COURT: I don't remember that issue specifically but if I've already ruled on it, I don't feel like I need to reverse myself. It doesn't sound like that there's anything more before me that than was before me earlier.

¶11. After jury selection, the Wellses began their case-in-chief, and the first witness was Felicia, who testified, *inter alia*, that she had incurred more than $100,000 in medical bills as a consequence of Dr. Tucker's alleged medical negligence. Felicia was employed as an ICU nurse with Central Mississippi Medical Center, and her husband, Reginald, was

6

employed as a forklift operator with Sysco, Inc. After Reginald testified, counsel for Dr. Tucker argued that the Wellses had opened the door on the collateral source rule. That is, Dr. Tucker's lawyer claimed that, based on testimony that the Wellses could not bear the financial burden of Felicia's medical bills, he should be permitted to introduce evidence that health insurance satisfied portions of the Wellses' obligations. Counsel for the Wellses disagreed. Further, counsel for the Wellses suggested that, should the circuit court find that the door was opened regarding the collateral source rule, the circuit court should permit cross-examination of Dr. Tucker's experts to demonstrate their inherent bias due to commonality of coverage.

¶12.   The circuit court stated:

> [L]isten, counsel, let me tell you something. We're just all kidding ourselves. This jury knows all about insurance. They know that this plaintiff probably had medical coverage through her place of employment that has covered at least a portion of the medical bills, and maybe through Mr. Wells' employment. I'll tell you, this is a whole bunch of to-do about nothing. There's not a person on that jury that doesn't know about insurance coverage. But I'm going to leave it like it is.

¶13.   Shortly afterwards, the circuit court added:

> But I really do think y'all are headed down -- you know, this is a red herring. It's a path that's going to cause more trouble than it's worth. There's not a person on that jury that doesn't know that there's insurance coverage involved on both sides.

¶14.   Accordingly, the Wellses were never permitted to impeach Dr. Tucker's experts by seeking to demonstrate that, due to commonality of insurance coverage, they had a direct interest in a verdict for Dr. Tucker. Likewise, the trial judge did not permit Dr. Tucker's

counsel to present evidence of the existence of the Wellses' medical insurance policy which may have covered all or part of the Wellses' medical expenses. The jury returned a verdict for Dr. Tucker. On November 14, 2005, the circuit court entered its final judgment. Following unsuccessful post-trial motions, the Wellses appeal. *Wells v. Tucker*, 2007 Miss. App. LEXIS 594, \*\*4-13, ¶¶9-17.

## PROCEEDINGS IN THE COURT OF APPEALS

¶15. The Wellses raised four issues on appeal: (1) whether the trial court erred in failing to grant the plaintiffs' motion to strike and motion in limine concerning the testimony of defense experts Dr. Paul Rice, Dr. John Morrison, and Dr. James Martin; (2) whether the trial court erred in refusing to allow the Wellses to cross examine Dr. Tucker's experts regarding potential bias; (3) whether the trial court erred in failing to excuse Juror Number 12 for

sleeping during trial;[1] and (4) whether the trial court erred in failing to grant the plaintiffs' Motion for Judgment Notwithstanding the Verdict.

¶16. The Court of Appeals determined that the circuit court had erred when it failed to allow cross-examination of Dr. Tucker's experts to demonstrate bias. Essentially, the Court of Appeals concluded that it was error on the part of the trial court when it did not permit the Wellses' cross-examination of Dr. Tucker's experts regarding the fact that they share a

---

[1]The Wellses initially presented this issue for appeal, but later decided to withdraw it. In their brief, the Wellses stated, "Plaintiffs originally presented this issue for appeal but in the interests of expediency wish to drop this issue at this time. The plaintiff requests that this court focus its attention solely on the above seminal issue of law that goes to the heart of fairness in civil trials." Thus, this issue is no longer ripe for discussion.

Additionally, we note that upon objections by the Wellses' counsel, the circuit court adamantly stated:

> THE COURT: Mr. Gibbs, unfortunately, you and Mr. Tabor are absolutely incorrect. I watch every juror during the entire case. He did not only not fall asleep, he didn't fall asleep for any period of time. That's not to say that he didn't close his eyes some, that he didn't shift around in his seat. If you want to know the truth, alternate number two down there probably was nodding off more than he was, if you want to call that nodding off. You're just both absolutely incorrect in your analysis. And I know you're trying to make a record, but that juror simply was not ever asleep. He was paying attention throughout the entire video. He wasn't necessarily staring at the video all the time. Neither were all the rest of the jurors. But I just want to be adamant. You are incorrect whenever you state he was asleep. He was never asleep, he never nodded off. There is absolutely no reason to strike this juror from this jury. The record is clear. That will be denied. We'll stand in recess just for a few minutes.

9

common insurance carrier, MACM. In doing so the Court of Appeals relied on Mississippi

Rule of Evidence 411, which states:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

¶17. Furthermore, the Court of Appeals stated:

> There can be no doubt that evidence of liability insurance is not strictly or rigidly prohibited. According to M.R.E. Rule 411, it may be admitted if offered for another purpose. One of those contemplated purposes is the demonstration of bias or prejudice. To resolve this issue, we must conduct a balancing test. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. "M.R.E. 403 is the ultimate filter through which all evidentiary objections eventually flow." *Walker,* 914 So. 2d at 1270 (P33).

*Wells v. Tucker*, 2007 Miss. App. LEXIS 594, *16, ¶22.

¶18. Applying this balancing test, the Court of Appeals concluded:

> There can be no doubt that Dr. Tucker's MACM insured experts had some financial interest in the outcome. Houpt's affidavit demonstrated that they had at least a $136 interest, representing the amounts their equity accounts could decrease in the event of a $500,000 verdict against Dr. Tucker.
>
> . . . .
>
> Before any court may exclude otherwise competent and relevant evidence under the ultimate filter of M.R.E. Rule 403, it must determine that the danger of unfair prejudice *substantially* outweighs its probative value. *Smith v. State*, 733 So. 2d 793, 801 (Miss. 1999). It is exceedingly difficult to conclude just how there may be any unfair prejudice to Dr. Tucker if the jury already knew or assumed he had liability insurance in this case. On the other hand, the Wells claimed that, like Dr. Tucker, every one of Dr. Tucker's experts were MACM insureds and that, as a result, Dr. Tucker's experts had a direct financial interest in the outcome of this litigation by way of monetary

10

deduction from their equity accounts as well as an increase in their premiums. Counsel for the Wells was never permitted to cross-examine Dr. Tucker's experts on subjects such as whether any MACM member has ever testified as a plaintiff's expert for a patient against another MACM member and, if so, whether that doctor is still a MACM member. It is without dispute that such evidence is relevant and probative of potential bias and/or prejudice of the expert.

*Id*. at \*\*24, 27-28, ¶¶33, 38.

¶19. Based on the above reasoning, the Court of Appeals reversed the verdict of the jury and remanded this case for a new trial. As such, the Court of Appeals avoided answering the questions of whether the verdict was contrary to the weight of the evidence or whether the evidence was sufficient to render a verdict for Dr. Tucker, by deciding these issues were moot.

### DISCUSSION

¶20. In his petition for writ of certiorari, Dr. Tucker asserts that the Court of Appeals' majority decision is in direct conflict with its earlier decision in *Toche v. Killebrew*, 734 So. 2d 276 (Miss. Ct. App. 1999). As such, Dr. Tucker contends that the dissent authored by Judge Griffis correctly applies longstanding precedent. *Wells*, 2007 Miss. App. LEXIS 594, \*\*31-45, ¶¶44-58 (Griffis, J., dissenting). We find *Toche* to be directly on point with this issue; thus, we agree with Judge Griffis's dissent in its entirety.

¶21. For the sake of discussion, the Court of Appeals combined issues I and II. Thus, the majority introduces the issue of this appeal as follows: "Did the circuit court err when it prohibited cross-examination of Dr. Tucker's experts regarding their commonality of medical

11

malpractice liability insurance?" *Wells*, 2007 Miss. App. LEXIS 594, *13. We restate the

issue here for the sake of discussion.

### I. WHETHER THE ECONOMIC OR FINANCIAL BIAS OF DR. TUCKER'S WITNESSES ALLOWED THE PLAINTIFFS AN OPPORTUNITY TO OFFER IMPEACHMENT EVIDENCE TO SHOW BIAS.

¶22. The Wellses contend that the trial court erred in refusing to allow the cross-

examination of defense experts Dr. Paul Rice, Dr. John Colter Morrison, and Dr. James

Martin, as to the fact that all three physicians had their medical malpractice insurance

coverage through MACM, the same medical malpractice insurance company as the

defendant, Dr. Tucker. The Wellses asserted that the purpose of such cross-examination was

to impeach the credibility of the physicians by showing possible bias.

¶23. The trial court, in considering the Wellses' motion in limine, found that "under Rule

403, any probative value that may flow from the examination of the witness in this area [of

liability insurance] is far outweighed by the prejudice that would result from the admission

of the insurance issue before the jury. . . ." Therefore, the circuit court denied the Wellses'

Motion in Limine. On appeal, the Court of Appeals reversed, determining:

> There can be no doubt that Dr. Tucker's MACM insured experts had some
> financial interest in the outcome. Houpt's affidavit demonstrated that they had
> at least a $136 interest, representing the amounts their equity accounts could
> decrease in the event of a $500,000 verdict against Dr. Tucker. According to
> the Wells, even if Houpt's affidavit is completely accurate, and not skewed in
> favor of Dr. Tucker, Houpt's affidavit still shows that Dr. Rice and Dr.
> Morrison had a monetary interest in the litigation against Dr. Tucker. It is also
> very well possible, if not certain, that the MACM experts' own premiums were
> calculated based on the losses or lack of losses due to settlements or adverse
> verdicts against MACM insureds.

12

*Wells v. Tucker*, 2007 Miss. App. LEXIS 594, **24-25, ¶33. Additionally, the Court of

Appeals placed undue emphasis on the trial judge's comments:

> [L]isten, counsel, let me tell you something. We're just all kidding ourselves.
> This jury knows all about insurance. They know that this plaintiff probably
> had medical coverage through her place of employment that has covered at
> least a portion of the medical bills, and maybe through Mr. Wells'
> employment. I'll tell you, this is a whole bunch of to-do about nothing. There's
> not a person on that jury that doesn't know about insurance coverage. But I'm
> going to leave it like it is.
>
> . . . .
>
> But I really do think y'all are headed down -- you know, this is a red herring.
> It's a path that's going to cause more trouble than it's worth. There's not a
> person on that jury that doesn't know that there's insurance coverage involved
> on both sides.

*Wells v. Tucker*, 2007 Miss. App. LEXIS 594, **12-13, ¶17.

¶24.    Specifically, the Court of Appeals stated:

> [I]t is difficult to understand the circuit court's logic in excluding the evidence
> when the circuit court explicitly stated that the jury was already aware that Dr.
> Tucker had medical professional liability insurance.
>
> . . . .
>
> If the circuit court believed that the jury knew about the presence of insurance,
> then there can be no prejudicial effect in placing it before the jury.  Applying
> the balancing test, the evidence had some probative value and, according to the
> circuit court's line of reasoning, there would have been no prejudice in
> allowing the jury to hear that Dr. Tucker had insurance.

*Id*. at **26, 30, ¶¶35, 41.

¶25.    The Court of Appeals obviously based its decision in part on what the trial judge said

at trial – "[t]his jury knows all about insurance" – as opposed to what the trial judge

ultimately did and his sound reasoning for doing so.  Additionally, the Court of Appeals

focused on the trial judge's passing remark at trial, which was made nearly two years after

13

his order of December 15, 2003, in which he denied the Wellses' motion in limine and motion to strike defense experts. A trial judge enjoys considerable discretion in allowing or refusing evidence, and a trial judge's decision concerning the admissibility of evidence will stand absent an abuse of discretion. *Poole v. Avara*, 908 So. 2d 716, 721 (Miss. 2005) (citing *Miss. Transp. Comm'n v. McLemore,* 863 So. 2d 31, 34 (Miss. 2003)).

¶26.    We agree with the Court of Appeals' dissent that the circuit judge did not abuse his discretion when ruling that such evidence should be excluded. In truth, the circuit judge correctly applied *Toche*, which dealt with primarily the same issue as we have before us – whether evidence of a liability insurance policy may be introduced to show economic or financial bias by a defense witness. *Toche*, 734 So. 2d at 283.

¶27.    In *Toche*, the court recognized "[t]here is a long-standing principle of law in [Mississippi] that gratuitously informing the jury, or even intimating to the jury, that any verdict returned by [it] will be satisfied by the defendant's liability insurance provider so interferes with the jury's ability to fairly deliberate the true issues of the case as to constitute reversible error." *Toche*, 734 So. 2d at 283. The court went on to state there is a "well-established policy of this State against interjecting such information in the trial without legitimate purpose other than as an attempt to color the juror's view of the case." *Id.* As such, "this policy ought to weigh heavily against admitting such evidence under Rule 403 even though some alternate basis for admitting it might have some arguable legal basis." *Id*.

14

¶28. While it is true that Mississippi Rules of Evidence 411 and 616[2] permit the introduction of evidence pertaining to the existence of liability insurance to establish "bias or prejudice of a witness," the ultimate filter for all evidence is Rule 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Based on the balancing test of Rule 403, we cannot say that the trial judge abused his discretion in finding that the probative value of the evidence that Dr. Tucker's experts might incur a financial penalty of $136 if the Wellses were successful on their claim was substantially outweighed by the danger of unfair prejudice resulting from the admission of evidence concerning the existence of a liability insurance policy.

¶29. As Judge Griffis points out in his dissent:

> The jury had already heard evidence of economic or financial bias. The Wells' expert witness testified that he was being paid $400 per hour for his work. Dr. Tucker's experts testified that they were being paid $350 and $400 per hour for their work. Neither the Wells' nor Dr. Tucker's experts were asked about, and therefore did not testify as to, the total amount they were paid for their testimony. Counsel for neither the plaintiffs nor the defendants pressed the witnesses to explain their total financial compensation for their appearance and their testimony. All of the experts received a direct financial benefit of thousands, if not tens of thousands, of dollars for their services and their testimony. I hardly see how the testimony that Dr. Tucker's experts may

---

[2]We have already quoted Rule 411 from the Court of Appeals' opinion, *supra*. Rule 616 of the Mississippi Rules of Evidence states:

For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible.

receive the benefit of $136 could be considered a bias or prejudice for their testimony that would be sufficient to allow the jury to learn that Dr. Tucker had liability insurance available to pay any verdict that was rendered.

I am even more persuaded by what information the plaintiffs' counsel did not seek on cross-examination of Dr. Tucker's experts. As discussed above, plaintiffs' counsel did not ask Dr. Tucker's experts about the total or cumulative amount they earned by testifying. Evidence of the total amount paid could show direct and substantial financial bias. Likewise, counsel did not ask Dr. Tucker's experts about their experiences as an expert witness, i.e. number of times they testified, whether they solicited witness opportunities, whether they ever testified on behalf of a plaintiff, or whether their testimony was always on behalf of a defendant physician. Testimony on either of these subjects, which was available to plaintiffs' counsel, could have been used to show substantial bias or prejudice by Dr. Tucker's experts. The failure of plaintiffs counsel to cross-examine Dr. Tucker's experts on these issues confirms to me that the real motivation behind the plaintiffs' efforts was to introduce evidence of the existence of a liability insurance policy. The exclusion of a very minimal financial connection between the defendant/physician and his expert witnesses was a reasonable application of the Mississippi Rules of Evidence. The interjection of liability insurance would have allowed the jury to decide this case on improper grounds.

In conclusion, the practical impact of the majority's decision is that, in future cases, only out-of-state experts will be available to testify as to the standard of care in medical malpractice cases in Mississippi.

***Wells v. Tucker***, 2007 Miss. App. LEXIS 594, **43-45, ¶¶55-57 (Griffis, J., dissenting).

¶30.    For the reasons stated, we find that the Court of Appeals erred in finding that the circuit judge abused his discretion in excluding evidence of liability insurance. Since the Court of Appeals did not address the remaining issues presented by the Wellses based on its decision to reverse and remand for a new trial on the issue we have found to be without merit, we now discuss the remaining issues, which understandably were not addressed by the Court of Appeals.

16

## II. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT PLAINTIFFS' MOTION FOR JNOV, OR, IN THE ALTERNATIVE, A NEW TRIAL.

¶31. While the Wellses correctly set out the law pertaining to the appropriate criteria to be considered by the trial court and the appellate court in determining whether a motion for a judgment notwithstanding the verdict should be granted or denied, they assert error only as to the trial court's failure to grant their motion for a new trial "based on biased and prejudicial testimonies influenced by the personal interests of [Dr. Tucker's] expert witnesses" which were never revealed to the jury due to the trial judge's exclusion of this evidence.

¶32. When considering whether the trial court erred in refusing to grant a party's motion for a new trial, "this Court will overturn the verdict only when it is against the overwhelming weight of the evidence." *Tentoni v. Slayden*, 968 So. 2d 431, 442 (Miss. 2007) (quoting *Poole*, 908 So. 2d at 727). *See also* *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005). "Stated differently, we will not set aside a jury's verdict and order a new trial unless we are convinced that the verdict was contrary to the substantial weight of the evidence so that justice requires that a new trial be granted." *Poole*, 908 So. 2d at 727 (citing *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 714 (Miss. 1984) (Robertson, J., specially concurring)).

¶33. In applying the "overwhelming weight of the evidence" criteria in today's case, we must determine whether the trial judge abused his discretion in denying the Wellses' motion for a new trial. *White v. Stewman*, 932 So. 2d 27, 33 (Miss. 2006) (citing *White v. Yellow Freight System, Inc.* 905 So. 2d 506, 510-11 (Miss. 2004)). We keep in mind that the

17

Wellses assert that they are entitled to a new trial because, *inter alia*, the trial court refused to permit their cross-examination of Dr. Tucker's experts concerning the fact that they, like Dr. Tucker, were MACM insureds, thus exhibiting bias. Again, this Court's standard of review concerning a trial judge's decision to admit or deny evidence is likewise abuse of discretion. **Whitten v. Cox**, 799 So. 2d 1, 13 (Miss. 2000). "Where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" **Id.** (quoting **Floyd v. City of Crystal Springs**, 749 So. 2d 110, 113 (Miss. 1999)). *See also* **In re Estate of Mask**, 703 So. 2d 852, 859 (Miss. 1997); **Terrain Enters, Inc. v. Mockbee**, 654 So. 2d 1122, 1131 (Miss. 1995).

¶34. The Wellses' motion for a new trial asserts that the jury's verdict was substantially the result of biased and prejudicial testimony influenced by the personal interests of the defense experts. Thus, the Wellses claim that the jury did not have the opportunity to weigh the evidence fairly in this case. In our discussion of Issue I, *supra*, we have already concluded that the trial court did not abuse its discretion in disallowing the cross-examination of Dr. Tucker's experts on the MACM issue.

¶35. Additionally, from the record before us, including the testimony of the Wellses' witnesses, Felicia Lynette Wells, Reginald Wells, Dr. Tucker (as an adverse witness), Dr. Walter Jones, Ruthie Ransom, and Dr. Bruce Halbridge, as well as Dr. Tucker's witnesses, Dr. Charles Bush, Jr., Dr. Paul Rice, and Dr. John Colter Morrison, as well as the various medical records, we cannot conclude that the jury's verdict, which in essence found that whatever happened to Felicia Wells was not due to any negligence on the part of Dr. Tucker,

18

was so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice. Briefly stated, the record reveals, *inter alia*, that the Wellses' own medical expert, Dr. Halbridge, did not disagree with Dr. Tucker's decision to perform a Cesarean section on Felicia Wells, who asserted that Dr. Tucker negligently perforated her bowel while performing the C-section, thus proximately causing her resulting injuries and damages. One of Dr. Tucker's witnesses, Dr. Bush, testified that the retractors used for checking for various potential problems behind the uterus were not even placed in the vicinity of the bowel located behind the uterus. Dr. Morrison testified that almost always (99% of the time), any bowel perforation is discovered prior to closing up the patient, since among other things, a bowel perforation would involve fecal matter and toxins spilling into the abdomen, thereby causing a distinct odor. Additionally, Felicia Wells testified that it was not until six days after her C-section, when she had improved to the extent of planning to be discharged, that she began to experience a sharp pain. According to testimony, this ruled out a bowel perforation during the C-section, since symptoms would have surfaced within twenty-four hours after perforation. Dr. Rice opined that Felicia Wells had a diverticulum to rupture, thus causing the sudden onset of pain six days post-operation. Therefore, when the jury compared this testimony with the testimony of Dr. Halbridge and other witnesses who testified for the Wellses, it unquestionably became a jury issue as to whether Dr. Tucker was negligent.

¶36. Thus, in considering the totality of the record before us, we conclude that the trial judge did not abuse his discretion in finding that the jury verdict was supported by substantial

credible evidence, thus denying the motion for a new trial. As discussed, *supra*, the trial court did not abuse its discretion in prohibiting the Wellses from cross-examining Dr. Tucker's defense experts about their commonality of insurance coverage. In sum, the jury was presented with two competing positions and returned a verdict in favor of Dr. Tucker. We thus find this issue to be without merit.

## CONCLUSION

¶37.    For the reasons stated, we reverse the judgment of the Court of Appeals and reinstate and affirm the Rankin County Circuit Court judgment entered consistent with the jury's verdict in favor of Dr. Tucker, individually and in the scope of his employment and/or agency for Jackson Healthcare for Women, P.A.

¶38.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED**.

**SMITH, C.J., WALLER, P.J., RANDOLPH AND LAMAR, JJ., CONCUR. RANDOLPH, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND CARLSON, J. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND GRAVES, JJ.; DICKINSON, J., JOINS IN PART. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J.; GRAVES, J., JOINS IN PART.**

**RANDOLPH, JUSTICE, CONCURRING:**

¶39.    "Our application of stare decisis is necessary, inter alia, so that trial courts can make correct decisions and lawyers can properly advise their clients." ***United Servs. Auto. Ass'n v. Stewart***, 919 So. 2d 24, 30 (Miss. 2005).

¶40.   Certiorari was accepted in this case because the Court of Appeals rendered a decision in conflict with a prior decision of the Court of Appeals. Mississippi Rule of Appellate Procedure 17(a)(1) (emphasis added) states:

> a) Decisions of Court of Appeals reviewable by writ of certiorari. A decision of the Court of Appeals is a final decision which is not reviewable by the Supreme Court except on writ of certiorari. Review on writ of certiorari is not a matter of right, but a matter of judicial discretion. The Supreme Court may grant a petition for writ of certiorari on the affirmative vote of four of its members and may, by granting such writ, review any decision of the Court of Appeals. Successive review of a decision of the Court of Appeals by the Supreme Court will ordinarily be granted only for the purpose of resolving substantial questions of law of general significance. Review will ordinarily be limited to:

> (1) cases in which it appears that the Court of Appeals has rendered a decision *which is in conflict with a prior decision of the Court of Appeals* or published Supreme Court decision.

¶41.   In 1999, the Court of Appeals unanimously[3] resolved this very issue, and the trial judge was eminently correct to rely upon this established precedent. *See Toche v. Killibrew,* 734 So. 2d 276 (Miss. Ct. App. 1999). When rendering a decision, a trial judge must be able to rely on existing case law and the Mississippi Rules of Evidence, which is precisely what occurred.

¶42.   The Court of Appeals sought to avoid the conundrum posed by the precedential authority of *Toche,* by dismissively describing *Toche* as a case dealing with a "related issue." *See Wells v. Tucker,* 2007 Miss. App. LEXIS 594, *16 (Miss. Ct. App. Sept. 2007). Rather

---

[3]Seven judges concurring, no judges dissenting and three judges not participating.

than apply the doctrine of stare decisis, the Court of Appeals[4] sought "enlightenment" by turning to twelve other jurisdictions for an answer to the precise question it had already answered only nine years earlier, and then rejected the "connections" or "substantial connections" test established by ten of the twelve jurisdictions.[5] "The substantial connection analysis looks to whether a witness has a 'sufficient degree of 'connection' with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness.'" *Id.* at *17 (quoting ***Bonser v. Shainholtz,*** 3 P.3d 422, 425 (Colo. 2000) (quoting ***Otwell v. Bryant,*** 497 So. 2d 111, 115 (Ala. 1986)).

¶43.    The only distinction of substance which can be gleaned from comparing ***Toche*** to ***Wells*** is the judges who serve on that court. In the ***Toche*** decision, then-Judge Diaz joined in the unanimous decision. Justice Diaz, now dissenting, subscribes to an opposing viewpoint, without providing a legal analysis for the abrupt departure from the ***Toche*** holding**.**

¶44.    Of course, it lies within the prerogative of courts to overrule prior precedent, but only when it is required, and then based on well-settled principles. *See* Victor E. Schwartz, Cary Silverman & Phil Goldberg, *Toward Neutral Principles of Stare Decisis in Tort Law,* 58 South Car. L. Rev. 2, 328-29 (Winter 2006). In the case sub judice, a plurality of the Court

---

[4]Five judges concurring, three dissenting and two judges not participating.

[5]Alabama, Arizona, Colorado, District of Columbia, Georgia, Nebraska, North Carolina, Oklahoma, Tennessee and Texas.

of Appeals, and now this Court's dissent, fail to adhere to this indispensable doctrine. As the trial judge correctly applied existing law, his decision requires affirmance.

¶45.    The ruling of the trial court stands in accord with the evidentiary rulings of our state dating back to at least 1902. *See* **Herrin v. Daly,** 80 Miss. 340, 31 So. 790 (1902). In **Herrin,** this Court found that the introduction of evidence of liability insurance "could not conceivably throw any light on the issue, and could have no other tendency than to seduce a verdict on the ground that an insurance company and not the defendants, would be affected." **Herrin v. Daly,** 80 Miss. at 341, 31 So. at 791. In 1985, the same reasoning was followed by this Court when it enacted Mississippi Rule of Evidence 411.[6]

¶46.    The goal of courts of justice is to promote an independent and fair forum for the resolution of disputes. The bench and bar must be able to rely on precedent, in order to best serve the parties and also to ensure an impartial forum in which to seek the truth.

**SMITH, C.J., AND CARLSON, J., JOIN THIS OPINION.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶47.    I conclude that the trial judge abused his discretion in excluding the evidence that Dr. Tucker and his expert witnesses held a common association and interest in Medical Assurance Company of Mississippi (MACM). The probative value of this evidence is clearly not substantially outweighed by the danger that it will unfairly prejudice the jury. Under the

---

[6]The Comment to Mississippi Rule of Evidence 411 states, "One of the primary reasons for excluding evidence of insurance or the lack of it is to prevent the jury from deciding the case on improper grounds. . . .

23

facts of this case, this evidence certainly would affect the credibility of Dr. Tucker's expert witnesses, but that would not be prejudicial. In order for a trial to be a search for the truth, jurors must be able to consider evidence that goes to the credibility of a witness, especially an expert witness. Therefore, I dissent.

¶48. The majority contends that the trial judge did not abuse his discretion by ruling that the probative value of the evidence that Dr. Rice and Dr. Morrison had a financial interest in the outcome of the case was substantially outweighed by its possible prejudicial effect. I do not understand how the majority or the trial judge reached this conclusion when the probative value of this evidence clearly outweighs the slight danger that it might unfairly prejudice the jury. The only prejudicial effect this evidence could have, if admitted, would be to make the jury aware that Dr. Tucker is insured and would not have to pay damages out of his own pocket in the event that it returned a verdict in the Wellses's favor. As the Court of Appeals explained: "It is exceedingly difficult to conclude just how there may be any unfair prejudice to Dr. Tucker if the jury already knew or assumed he had liability insurance in this case." *Wells v. Tucker*, 2007 Miss. App. LEXIS 594, *28 (Sept. 4, 2007). Dr. Tucker and his counsel clearly were not worried about the prejudicial effect that this evidence might have on the jury; they were worried about the impact it would have on the credibility of Dr. Rice and Dr. Morrison: "[C]ounsel for Dr. Tucker admitted during oral argument that cross-examination of his experts to show commonality of coverage would have a substantial effect on their credibility." *Id.* at *25.

¶49.	By contrast, the probative value of this evidence dwarfs its possible prejudicial effect. It is beyond dispute that this evidence is probative of bias and prejudice on the part of Dr. Rice and Dr. Morrison. Michael Houpt's affidavit establishes that Dr. Rice and Dr. Morrison had a financial interest in the jury returning a verdict for Dr. Tucker.[7] Moreover, "[i]t is also very well possible, if not certain, that the MACM experts' own premiums were calculated based on the losses or lack of losses due to settlements or adverse verdicts against MACM insureds." *Id.* at **24-25. To be sure, "it is difficult to calculate just how probative [this] evidence is" of bias and prejudice. *Id.* at *25. But as the Court of Appeals noted, "[i]t [is] sufficiently probative of bias that Dr. Tucker's counsel opined to the circuit court that, should the circuit court admit it, he would have to find different experts." *Id.*

¶50.	Because this evidence relates almost exclusively to the credibility of Dr. Rice and Dr. Morrison, I believe it is imperative that the jury be able to consider it in assessing how much weight to accord their expert testimony. The Court of Appeals made this point very eloquently:

> It seems important to step back a moment and look at the forest instead of the trees. This is a complex medical negligence suit. It may be accurately described as a "war of the experts." The Wells' expert claimed Dr. Tucker breached the minimum acceptable standard of care when he negligently caused a perforation of Felicia's colon during her C-section. However, Dr. Tucker's experts claimed that Felicia experienced an "ileus" and that Felicia's complications were not the result of any medical negligence. A lay jury of

---

[7]Mr. Houpt admitted that each physician receives the balance of his or her equity account upon death, disability or retirement. Mr. Houpt did not, however, disclose the balance of the equity accounts held by Dr. Tucker or his experts, which represent the common interest in MACM Dr. Tucker holds with his experts.

twelve citizens is called upon to evaluate this complex medical testimony and determine the truth to the best of their ability. The credibility of each party's medical experts is crucial in this analysis and, more often than not, outcome determinative. It is, as it should be, a grave concern when any court limits a party from appropriately testing the credibility of such medical experts by exposing any potential bias or prejudice that an expert may have in favoring one party or the other.

*Id.* at *27.

¶51. Justice Randolph's separate opinion is based entirely on his erroneous assertion that *Toche v. Killibrew*, 734 So. 2d 276 (Miss. Ct. App. 1999), is indistinguishable from the present case. This conclusion is pure poppycock.[8] The Court of Appeals held in *Toche* that there is a long-standing rule prohibiting "gratuitously" informing the jury that any verdict would be satisfied by the defendant's insurance provider. *Id.* at 284. In other words, the court declined to allow introduction of the existence of liability insurance based "*solely* on

---

[8]The separate opinion also uses this falsity to argue that this dissent does not adhere to the doctrine of stare decisis, a peculiar assertion, given the frequency with which the author votes to overturn precedent. *See Caves v. Yarbrough*, 2007 Miss. LEXIS 614, (Nov. 1, 2007) (Randolph, J., concurring), *reh'g granted*, *withdrawn*, No. 2006-CA-01857-SCT (Miss. Sept. 25, 2008) (Randolph, J., concurring); *Dedeaux v. Pellerin Laundry, Inc.*, 947 So. 2d 900 (Miss. 2007); *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815 (Miss. 2006); *Myers v. City of McComb*, 943 So. 2d 1 (Miss. 2006) (opinion by Randolph, J.); *White v. Stewman*, 932 So. 2d 27 (Miss. 2006) (Randolph, J., concurring); *Cross Creek Prods. v. Scafidi*, 911 So. 2d 958 (Miss. 2005) (Randolph, J., concurring); *Owens v. Miss. Farm Bureau Cas. Ins. Co.*, 910 So. 2d 1065 (Miss. 2005) (Randolph, J., concurring); *Smith v. Hollins*, 905 So. 2d 1267 (Miss. 2005) (Randolph, J., concurring); *Waters v. Gnemi*, 907 So. 2d 307 (Miss. 2005) (Randolph, J., concurring); *Capital City Ins. Co. v. G.B. "Boots" Smith Corp.*, 889 So. 2d 505 (Miss. 2004) (Randolph, J., concurring).

an assertion that the witness and the defendant had the same liability carrier." *Id*. (emphasis supplied). However, the court recognized that there may be cases where "some alternate basis for admitting [such evidence] might have some arguable legal basis." *Id.* In the present case, the plaintiffs demonstrated significant alternate bases for inclusion of the evidence other than the mere existence of liability insurance – namely, that the MACM-insured experts had an *actual* and *direct* financial interest in the outcome; that, as the trial himself judge asserted, the jury was already aware of the existence of liability insurance; and that Wells was not permitted to cross-examine the experts "on subjects such as whether any MACM member has ever testified as a plaintiff's expert for a patient against another MACM member." *Wells* at *33-38. As the Court of Appeals recognized, *Toche* is in no way at odds with today's case and the court was not "plowing new ground." *Wells* at *23-25, 39.

¶52. Accordingly, I conclude that the trial judge abused his discretion by excluding evidence that Dr. Tucker, Dr. Rice and Dr. Morrison held a common interest in MACM. I would reverse and remand for a new trial.

**EASLEY AND GRAVES, JJ., JOIN THIS OPINION. DICKINSON, J., JOINS THIS OPINION IN PART.**

**DICKINSON, JUSTICE, DISSENTING**:

¶53. My dissent to the majority opinion is limited to the particular facts of this case, and should not be read as an indication that I believe trial judges should always allow evidence of membership in MACM, or any other organization, to go before the jury. My problem with this particular case is that the trial judge was required to perform a Rule 403 balancing test

to determine whether the probative value of the evidence outweighed the danger of unfair prejudice which would result from the jury learning that the doctors had insurance. The trial judge stated on the record that, in his opinion, the jury already knew that the doctors were insured. While I am not so sure the trial judge's opinion was correct, he apparently believed it. Therefore, if the trial judge believed the jury already knew the doctors were insured, I find it most difficult to understand how he could have concluded that the jury learning about the insurance could have had any prejudicial affect whatsoever. In other words, how can telling someone something they already know serve to prejudice them? Thus, in this particular case, I believe the trial judge abused his discretion in improperly performing the balancing test.

**DIAZ, P.J., JOINS THIS OPINION. GRAVES, J., JOINS THIS OPINION IN PART**.